## DePHUE *vs.* THE STATE.

[INDICTMENT FOR MANSLAUGHTER.]

1. *Reputation of physician who examined and testified as to wounds inflicted on deceased ; when admissible evidence on trial for manslaughter.*—On the trial of a defendant for manslaughter, the reputation of the physician who examined the wound which caused death, and who proved its character and effect to the jury, is not a part of the issue, and is irrelevant evidence on such trial, unless the reputation or capacity of the physician is assailed.

2. *Conviction ; when irrelevant evidence will reverse.*—Under a *general* charge by the court, which rests the conviction on *all* the evidence delivered before the jury, relevant or irrelevant, the conviction will be reversed, unless it appears from the record, that no conviction could be had otherwise than one which was certainly correct.

APPEAL from the City Court of Huntsville.

Tried before Hon. W. H. MOORE.

Joseph DePhue was indicted and tried for manslaughter in the first degree, at the August term, 1869, of the Huntsville city court, found guilty and sentenced to the penitentiary for three years.

The portion of the bill of exceptions, necessary to an understanding of the legal questions decided, is as follows : "The State introduced evidence showing that on the 2d day of July, 1869, in said county, an affray took place between the deceased, Lemuel Hannah, and the defendant, in the course of which the deceased was stabbed by the defendant with a pocket knife, the blade of which was about half or three quarters of an inch in width, and from three and one-half to four inches in length. There was no conflict in the evidence as to the nature or size of the weapon with which the wound was inflicted.

The State then introduced as a witness, one Abner L. Logan, who testified that he was and had been for a number of years a practicing physician ; that as such, he was called to see the deceased, and saw him two or three hours after he was stabbed ; that the wound was inflicted on the

left side, just below the last true rib, and above the first false rib; that it was about one and one-half inches in length, and about three and one-half to four inches in depth, ranging upwards and penetrating the right lung. There was no conflicting evidence as to the description of the wound as here given, (then follows description of medicines, &c., used); that he stitched the wound, or put a stitch in it; that he probed the wound when he first saw deceased, and was satisfied that he would die, and therefore advised deceased's father to remove him to his home, a distance of twelve miles. The wound bled but little when he first saw deceased, and principally internally.

There was evidence showing that the deceased was removed from the place where he was stabbed, to his father's, a distance of twelve miles, over a road rather rough in some places; that he was carried in an open spring wagon, with shucks thrown over the bottom of the bed, and a blanket and quilt spread over it for deceased to lie on; that it was about day-light in the morning of a very warm day in July, when the wagon with deceased started, and that he reached home between nine and ten o'clock in the morning, and lived about forty-eight hours thereafter; that the deceased was in much pain on the way, and frequently changed his position from the bottom of the bed to the driver's seat; that after deceased reached his father's, no physician was called to see him for more than twenty-four hours, though one lived within a mile.

The defendant then introduced as witnesses, J. J. Dement and Ed. Anthony, who testified that they were and had been, for a number of years, practicing physicians; that they had been surgeons in the army, and had skill and experience in the treatment of wounds; that the wound inflicted on the deceased, as described above, was a dangerous wound, though not necessarily fatal, but that if death was the result it should occasion no surprise; that stitching up such a wound entirely was not a good practice, although it might be proper to close it partly; that the removal of the deceased, under the facts above stated, was very bad treatment, and could but result injuriously to the deceased.

These witnesses were not present when Dr. Logan was examined, and did not hear his testimony. Logan's description of the wound was repeated to them by the counsel for defendant, and their opinions were given on the description thus given. They both stated that a physician who probed such a wound in person, and who visited the patient on the succeeding day and carefully examined his symptoms, would be much better prepared to pronounce definitely as to the result of such a wound, than one who had never seen the patient, but heard the wound described; that an intelligent physician, who had probed such a wound and visited the patient on the succeeding day and carefully examined his symptoms, might often be able to pronounce definitely as to the result.

On cross-examination of the witness, Dr. Dement, the State inquired of him if he knew the witness, Logan, and how long he had known him, and if he was not a practicing physician, and how long he had been such; and then inquired of said witness what was the reputation of said Logan as a physician. The defendant objected to the introduction of evidence of said Logan's reputation as a physician; but the court overruled such objection, and defendant excepted.

The witness testified, that Logan bore a good reputation as a physician; to the admission of which evidence the defendant objected, but the court overruled such objection and admitted the evidence, and defendant excepted.

This was all the evidence relating to the nature of said wound, or its treatment, or the reputation of said Logan. The court charged the jury, at the instance of the State, " that if they believed, from the evidence, that death ensued from the intentional application of unlawful force, though there may have been no specific intention to kill, and though the weapon used is not ordinarily calculated to produce death, the perpetrator is guilty of manslaughter in the first degree, under the statutes of this State, as he would be guilty of manslaughter at common law;" and defendant excepted.

WALKER & BRICKELL, for appellant.—1. The admission

of the evidence, as to the reputation of the witness, Logan, as a physician, was erroneous.—*Tullis v. Kidd,* 12 Ala. 648 ; 2 Phillips on Ev. C. and Head Notes, 762.

2. The error in the admission of this evidence must work a reversal, unless the record *affirmatively* shows that the defendant could not have been injured by it.—*Thompson v. State,* 20 Ala. 54.

"The admission of irrelevant testimony will reverse, unless *the record clearly* shows that no injury could have resulted. It is not enough that the court is not able to discover injury ; *it must see, and see clearly,* that none could have resulted."—*Frierson v. Frierson,* 21 Ala. 555.

In *Shields & Walker v. Henry & Mott,* 31 Ala. 53, it is said, "the rule is settled in this State, that if illegal evidence is admitted against the objection of the adversary, nothing less than explicit direction to the jury to disregard such evidence, will cure the error.

3. The rule in this State, is, that error raises the presumption of injury, and unless that presumption *is clearly rebutted* by the record, must reverse the judgment.—See authorities collected ; Shepherd's Dig. 568, § 83.

The court will, in a criminal case, involving the liberty of the citizen, hesitate to affirm that he has not been prejudiced by the admission of illegal evidence. There was some purpose prejudicial to the accused to be accomplished, or the State would not have offered the evidence, and against his objection pressed its admission. It may have been designed to induce the jury to accord a degree of evidence to Logan's evidence, to which his manner of testifying would not have entitled it. Without his evidence, it is apparent, a conviction of the appellant could not have been obtained. The evidence objected to may not have been corroboratory of the facts stated by him, but throws his reputation as a physician into the scale, to add weight to his statements. If the evidence had been of his reputation as a man, it would have been inadmissible, unless he had been impeached, and his reputation as a physician is equally irrelevant. Such evidence not only confuses the jury, diverts their attention from the real issues, but sub-

jects them to be influenced by considerations which should not enter into their verdict.

4. The affirmative charge of the court is expressed in the language of the first head note, *McManus v. State,* 36 Ala. 285. We respectfully submit, it is not a correct exposition of the law of this State.

Under our statute, manslaughter is divided into degrees, known as manslaughter in the first degree, and manslaughter in the second degree—the first, punishable by imprisonment in the penitentiary—the other, by fine and imprisonment in the county jail, or a sentence to hard labor for the county. The distinction between the two, is not that stated in McManus' case—the distinction between an unlawful accidental killing, and killing by the intentional application of unlawful force—but it is the distinction between an *unlawful intentional killing,* and an *unlawful accidental killing.*

Our Penal Code constitutes an entire system, and among its avowed objects is a mitigation of the severity of the common law, and an adaptation of punishment to the degree of criminality, not attainable under the rigid rules of the common law. Thus, at common law, all murders, however differing in criminality, were subjected to the same punishment. Manslaughter, whether denominated voluntary or involuntary, was visited with punishment of the same character. The Penal Code divides murder into degrees, and the controlling distinction is in the criminality of intent. Wilful, deliberate, premeditated murder, indicative of deeper depravity and darker malignity than a killing maliciously *only,* is punishable, or may be, capitally, while the latter is not. If the "proof be evident, or the presumption great," of the defendant's guilt of murder in the first degree, he is not entitled to bail. However clear may be his guilt of murder in the second degree, he is bailable of right. Such is the law of murder in this State, and we see that the change in the common law, produced by legislation, is an adaptation of punishment to the degree of criminal intent—making the intent with which the act is done, the measure of its criminality. Such being the change produced by legislation, in refer-

ence to murder, if the same legislation extends to and embraces manslaughter, it is but fair to presume, the same change would be produced, and the same legislative intent prevail in reference to that character of homicide. This presumption ripens into a conclusion, if the language employed by the legislature is significant of such an intent. " Manslaughter, by voluntarily depriving a human being of life, is manslaughter in the first degree ; and manslaughter, committed under any other circumstances, is manslaughter in the second degree."  If the legislature had intended to observe and preserve the common law distinction, they would have adopted the well known and familiar common law terms—voluntary and involuntary manslaughter, and prescribed the punishment of each. But instead of this, the legislature defines what is manslaughter in the first degree, and defines it as the *voluntary deprivation* of life. Manslaughter *committed under any other circumstances*, is *manslaughter in the second degree*—that is, when *not voluntary*. The concurrence of the will with the act is the characteristic of the other. There cannot be a voluntary deprivation of human life, unless the intent to take life exists. This intent may, as matter of law, be predicated from the use of a deadly weapon in a manner, the natural and almost inevitable consequence of which, is death. The facts which will prove such an intent are not a material inquiry in this case, but whether, as matter of law, this intent must not exist, as an essential element of manslaughter in the first degree. " Voluntary " and " involuntary," are words of frequent occurrence in law, and, we submit, are employed to designate and define acts. Thus, we have in our Penal Code a statute providing for the punishment of executive offenses, *voluntarily* permitting an escape, and also a statute punishing them for a *negligent* escape.—Revised Code, §§ 3569, 3570. Now, what is the difference between the two offenses ? In the one, the officer *wills*, *intends* the escape ; and in the other, does not *will, intend it ;* but is so careless in the performance of his duties, that the same result follows, as if his will had produced it. The *voluntary* escape is punishable by imprisonment in the penitentiary—the involuntary escape, by fine only.

The forms of indictment annexed to and forming part of the Code, sustain the view we have presented. The form of indictment for manslaughter in the first degree, is, that "A. B. unlawfully and *intentionally*, but without malice, killed C. D.," &c. For manslaughter in the second degree, is, that "A. B., unlawfully, but without malice, *or the intention to kill*, killed C. D.," &c. Read these forms in connection with § 4112, which provides that the indictment "must state the facts constituting the offense," &c. The indictment does not state the facts constituting the offense, and of these facts, one is, that the killing is intentional, and yet the court charged the jury, that although such is the allegation of the indictment, proof of the allegation is not essential to the defendant's conviction. The form of indictment prescribed is a legislative declaration of the facts necessary to constitute the offense.

The Penal Code is a substantial re-enactment of the section of the Penal Code of 1841, defining manslaughter.— Hay's Dig. 413, §§ 3, 4. In Oliver's case, 17 Ala. 600, in a very able opinion of Dargan, C. J., while the Penal Code of 1841 was of force, the question here presented was discussed and decided. It is said, "when the act is willfully or voluntarily done, without regard to circumstances of provocation, the law declares it manslaughter in the first degree. *It is the will, concurring with or directing the act, that fixes the grade of the crime, and to this test alone can we look to ascertain it.*" The authority of this case should not be regarded as destroyed, by the decision in McManus' case. It is an exposition of the law, more in accord with the spirit of our legislation, and a juster construction of the particular statute than the latter case. An examination of Oliver's case, will show that the doubt expressed in one part of the opinion in McManus' case, whether this question was there presented and decided, is not well founded.

JOSHUA MORSE, Attorney-General, *contra.*

PETERS, J.—It is said, that it is the duty of the judge who presides, to confine the evidence to the points in issue,

that the attention of the jury may not be distracted, nor the public time needlessly wasted.—1 Phillips Ev. p. 732, and notes; 4th Amer. Ed. Cow. & Hill. Here the issue was the fact of the manslaughter, of which the defendant below was accused.

It is very evident that the unimpeached reputation of the physician, a witness who examined the wound from the effects of which the deceased is supposed to have died, could not have had any more connection with the act of the killing, than the color or age of the doctor could have had with the same facts. Whether a witness, who is a physician, in such a case as this, has a reputation for skill, or the want of it, in his profession, is no part of the issue, unless the capacity of the witness, in his profession, is impeached.

In this case there was no such impeachment. The reputation, in his profession, of a medical witness, can neither prove nor disprove the facts necessary to establish such a homicide as amounts to the crime of manslaughter. Then, the reputation of Dr. Logan, as a physician, was wholly irrelevant, and it was improperly admitted, when it does not appear that his skill or capacity, in his profession, has been assailed. And such was the case here. A physician is an expert, and as such he may be asked questions which develop his capacity, to form a correct judgment upon the experiences of his profession; but his reputation has nothing to do with this; and it can only be sustained when it is impeached.—1 Burr. Law Dict. 589; *Expert*, Broom's Max. 721, margin; *Tullis v. Kidd*, 12 Ala. 648.

In criminal cases, the life or liberty of the accused is often most deeply concerned. It is the purpose of the law to guard and protect these with the most sedulous assiduity and certainty. Then, in such cases, no looseness of practice should be encouraged, which, by possibility, might lead to an improper conviction. A doubtful conviction is always an improper conviction. It is better, say the old authorities, that an indefinite number of guilty persons should escape, than that one, who is innocent, should be convicted and punished.—Starkie on Ev., Sharswood's Notes, pp. 729, 742; Hale, 290.

The wisdom and justice of this humane maxim is always held most sacred by the wisest and best judges. And, we think, it can be best upheld by adhering most strictly to the rule in criminal cases, which excludes all irrelevant testimony.

It is true that a reversal ought not to be allowed, so long as the record shows that the conviction has been certainly correct, and that the jury, upon whose verdict it is founded, were governed by the legal evidence alone, which tended to support it. The mere fact that the court refuses, upon objection, to exclude a part of the testimony delivered before them, is evidence to the jury that such testimony is of some importance, and tends to prove the guilt of the accused. And it justifies them in so considering it, particularly under a general charge which rests the verdict upon *all* the evidence not excluded from their consideration, as was done in this instance. We could not say that such a practice might not result in an improper conviction. And unless this incontestably appeared, this court could not say that the irrelevant evidence could have had no improper influence upon the verdict.

And although we reverse this cause with hesitancy and reluctance, yet, if such a practice is permitted to stand, it opens the way for a dangerous departure from a primary rule of evidence, which we do not feel willing to encourage or sanction.

The conviction is, therefore, reversed, and the cause remanded for a new trial. And the defendant below, if in custody, will be held in custody until legally discharged.