## Forcheimer & Co. v. Stewart.

1. **Expert Testimony:** AS TO DAMAGE TO HAMS IN TRANSIT: ADMISSI-BILITY. In an action to recover on account of the unsound condition of hams shipped from Council Bluffs, Iowa, to Mobile, Alabama, where there was direct and positive evidence that they were sound when shipped, *held* that the opinions of experts were admissible to prove that, if they were unsound when received at Mobile, after an ordinary transit, they must have been unsound when shipped. [REED, J., *dissenting.*]

2. ———: EFFECT OF CARE BESTOWED ON DAMAGED HAMS. In such case the opinion of an expert that, if the hams were unsound, tainted and skippery when they arrived, no care after arrival could have made them choice and merchantable, was properly excluded, since there was no pretense made by defendant that any care could have had that effect, and so the evidence was not pertinent to any issue.

3 ———: INQUIRY INTO WITNESS' KNOWLEDGE AND ABILITY: LIMITA-TION. While the weight of expert testimony often depends largely upon the knowledge and ability of the witness, it is not competent to prove such knowledge and ability by other witnesses, nor to go into an inquiry before a jury upon that subject, farther than it can be done by an examination of the witness himself. (See opinion for illustration and cases cited, and opinion on rehearing for cases distinguished.)

4. **Sale:** WARRANTY BY UNAUTHORIZED TELEGRAM OF BOOKKEEPER: RATIFICATION. Defendant, at Council Bluffs, Iowa, sold hams to plaintiffs, at Mobile, Alabama, and shipped them by rail. While they were in transit, a bookkeeper of defendant, not shown to have any authority beyond his clerical duties, and without the knowledge of defendant, telegraphed to defendant's broker at Mobile as follows: " Hams were rigidly inspected. Have parties pay draft. I will protect them." To this telegram the bookkeeper had signed the defendant's name, and upon the assurances contained in it, which went further than the original contract between the parties, plaintiffs paid the draft drawn on them for the hams. *Held* that defendant was not bound by the unauthorized warranty contained in the telegram, and that he did not ratify the telegram by receiving and retaining the money sent in reliance upon it, since he was entitled to receive and hold the money upon his original contract with plaintiffs. (*Eadie v. Ashbaugh*, 44 Iowa, 519, distinguished.)

*Appeal from Pottawattamie Circuit Court.*

WEDNESDAY, OCTOBER 26.

ACTION to recover for an alleged breach of a contract in the sale of hams. The case is before us upon a second appeal.

The first decision is reported in 65 Iowa, 593. The plaintiffs have now amended their petition, and set up an agreement alleged to have been entered into at the time the plaintiffs paid for the hams, whereby, as is alleged, the defendant agreed to fully protect the plaintiffs against any damage or loss which they might sustain by reason of any defect in the hams. There was a trial to a jury, and verdict and judgment were rendered for the defendant. The plaintiffs appeal.

*Jacob Sims* and *Flickinger Bros.*, for appellants.

*Sapp & Pusey* and *Lyman & Hunter*, for appellee.

ADAMS, CH. J.—The defendant, residing at Council Bluffs, through his agent, residing at Mobile, Alabama, took an order from the plaintiffs, residing at Mobile, for hams, to be shipped to them from Council Bluffs, in the summer of 1881. Delivery was made to the common carrier at Council Bluffs, but not in such a way as to constitute a delivery to the plaintiffs, because the defendant retained the title to the hams, and the right to control the same. For a statement and discussion of the facts and law relating thereto, reference is made to the former opinion, It was after the shipment, and while the hams were in transit, that the hams were paid for by the plaintiffs, and the title and right of control were transferred to them by the transfer of the bill of lading. The hams ordered by the plaintiffs were to be " choice sugar-cured, canvassed hams." The evidence tended strongly to show that the hams in question, at the time of the shipment, were of the quality ordered, and other evidence tended strongly to show that, at the time of the arrival of the hams at Mobile, they were tainted and skippery. It was held in the former opinion that, in the absence of any special agreement, the defendant's contract was fulfilled if the hams were of the quality ordered at the time that delivery was made by the transfer of the bill of lading.

I.  One Richards was examined as a witness in plaintiffs' behalf.  After testifying that he was engaged in the grocery business in Mobile, and had purchased hams of the defendant, Stewart, the same year and about the same season of the year, and that the hams were unsound, tainted and skippery when received in Mobile, he was asked a question in these words: " If these hams of plaintiffs' were in about the same condition on or about September 1, 1881, in Mobile, as were those you received from defendant on arrival, you may state from your experience generally, in handling and shipping such products that season of the year at Mobile, or other points in your region of country, whether or not, in your judgment, if properly handled while in transit, and received by ordinary route in ordinary time, they were in good condition, and merchantable choice hams, when shipped from Council Bluffs, Iowa?"  To this the witness answered: " In my judgment, it was impossible for them to be in sound condition when they were shipped from Council Bluffs, Iowa."  Afterwards the interrogatory and answer were excluded as immaterial and incompetent.  The exclusion of the evidence is assigned as error.

The evidence, to our mind, does not show very clearly that Richards' experience and observation in the shipment of hams at that season of the year from a northern to a southern market had been such as to enable the witness to properly express an opinion as to whether hams in good condition will stand shipment, under the circumstances mentioned, from Council Bluffs to Mobile, or, what is, we think, substantially the same thing, to answer the question propounded. But no question as to the competency of this witness to testify as an expert is raised in argument.  We have, then, merely to consider whether the evidence was properly excluded upon the ground upon which it was excluded, and that is, upon the ground that it was immaterial and incompetent.

It appears to us that the subject was one for expert testi-

mony.  Those who had been engaged in such shipments, or who had had considerable observation of them, could, we think, judge better than the jurors whether sound hams will stand shipment, under the circumstances supposed, from Council Bluffs to Mobile.  Counsel for the defendant do not, indeed, deny that this is so.  The objection made is that there was direct and positive evidence that the hams were not unsound when shipped.  But the plaintiffs dispute the correctness of the evidence.  They contend that the witnesses must have been untruthful or mistaken; and they introduce in rebuttal the expert evidence tending to show that, if the hams, while canvassed, were unsound and skippery when they arrived, they must have been so, to some extent at least, when they left Council Bluffs.  We think that the evidence was admissible for that purpose.

It must be observed that the witness was not asked to form the ultimate opinion which the jury was to form.  He was not asked to form an opinion upon the whole evidence, as the jury was to do, but from his experience merely; and the jury was then to consider that opinion, in connection with all the other evidence in the case.  In our opinion, the evidence was improperly excluded.

Another witness was introduced as an expert.  After testifying that he was a pork-packer at Sioux City, Iowa, and had been engaged in shipping hams to a southern market as far south as Mobile, he was asked a question in these words: " If about a car-load of sugar-cured, canvassed hams, of what are known as winter cured, packed in tierces, are shipped by rail from Council Bluffs, Iowa, to Mobile, Alabama, in the month of August, and are in transit about ten days, and properly handled while in transit, and on arrival in Mobile are found to be sour, tainted, and full of skippers, what would you say was the condition of such hams at the date of their shipment from Council Bluffs?  State fully, and give your means of knowledge."  To this the witness answered: " I should say their condition was bad at Council Bluffs.

If it had been good, they would not have been tainted and become skippery in ten days. If properly canvassed, they would not get skippery after they were canvassed, unless they were blown before they were canvassed." This evidence was excluded as immaterial and incompetent, and the plaintiffs assign the ruling as error.

The witness could not, of course, testify to the condition of the hams at the date of shipment as a fact, and, if the interrogatory could be understood as calling for such testimony, it would be objectionable. But we think that the witness understood that he was merely asked for an opinion, based upon his experience, and that the jury understood that nothing but such opinion was given. With this view, it appears to us that the evidence was admissible. What we have said would apply to some other evidence admitted, and afterwards excluded.

II. One Richards testified, in substance, that, if the hams in question were unsound, tainted and skippery when they arrived, no care after arrival could have made them choice and merchantable. The court excluded this evidence, and the ruling is assigned as error. We do not understand that there has been any pretense on the part of the defendant that the plaintiffs were guilty of negligence in failing to convert unsound, tainted and skippery hams into choice and merchantable hams. The evidence, therefore, it seems to us, was not pertinent to any issue.

2. ——: effect of care bestowed on damaged hams.

III. One Hurlburt was introduced as a witness on behalf of the defendant, and testified that he was in the employ of the defendant as the foreman of his house, and that he inspected the hams in question, and found them free from taint or skippers. Afterwards one Fuller was introduced by the defendant as a witness, and was allowed to testify, against the objection of the plaintiffs, that the witness Hurlburt was a good judge of meats, and was regarded by the trade as a competent inspec-

3. ——: inquiry into witness' knowledge and ability: limitation.

tor. The admission of this evidence is assigned as error. We do not think it was competent to show by Fuller, either Hurlburt's reputation as an inspector, or what Fuller's opinion was of his merits. If that were allowable, it would have been equally allowable to call witnesses to prove that, in their opinion, Hurlburt was incompetent, or was so regarded by the trade. Again, if Fuller could properly be allowed to give an opinion as to Hurlburt's merits, so as to strengthen Hurlburt's testimony as a witness, we see no reason why Fuller's opinion could not be impeached by showing by other witnesses that he was not qualified to judge of Hurlburt's merits. Inquiries, indeed, of that character, might be extended indefinitely. The weight of testimony often depends largely upon the knowledge or ability of the witness; but it is not competent to go into an inquiry before a jury upon that subject, further than it can be done by an examination of the witness himself. (*Tullis v. Kidd*, 12 Ala., 648; *De Phue v. State*, 44 Ala., 32.) In allowing Fuller to testify as to the witness Hurlburt, we think that the court erred.

IV. On the 23d of August, Wilson, the defendant's agent or broker at Mobile, received a telegram, purporting to be signed by the defendant, and in these words: "Hams were rigidly inspected. Have parties pay drafts. I will protect them." This telegram was shown by Wilson to the plaintiffs, and thereupon they paid the draft drawn on them for the hams. Before the last trial, they pleaded this telegram as constituting a warranty that the hams were good, and would remain so until they should be laid down at Mobile. As touching this telegram, the court gave an instruction in these words: "A copy of a telegram, claimed to have been received by the broker on the 23d of August, has been introduced in evidence, and it is claimed by the plaintiffs that this telegram was shown to them before they paid for the goods, and that they were induced to pay for them on the strength of the assurance contained therein. The defendant

*4. SALE: warranty by unauthorized telegram of bookkeeper: ratification.*

claims, with reference to this telegram, that it was sent specially with reference to other parties and another transaction. If this claim is true, .the telegram cannot be treated as containing a warranty of the goods in question to the plaintiffs. It is also claimed by the defendant that this telegram was sent by a clerk, and that he had no authority to send it. It must be shown, before any weight can be given to this telegram, that it was sent by the authority of the defendant, and that it referred, either to the plaintiffs and the merchandise purchased by them, or that it referred, generally, to all the parties with whom the broker had made contracts for the defendant, or all the goods which he had sold for him. If the telegram was sent by authority of the defendant, and it referred either specifically to plaintiffs, and the merchandise purchased by them, or, generally, to all the parties with whom the broker had made contracts, and the goods he had sold them, and plaintiffs were induced by the telegram to pay for the merchandise which they had contracted for, the assurance contained in the telegram would continue the warranty of the quality of the goods until they. arrived at Mobile, and the inquiry must be whether, at that time, the goods corresponded in quality with the warranty." The giving of this instruction is assigned as error.

The evidence shows that the defendant did not send the telegram, nor, sign it; but that one Patterson, a book-keeper and clerk of the defendant, sent it, and signed the defendant's name to it, without the knowledge of the defendant, who was then absent from home. The plaintiffs contend, however, that there was evidence tending to show that Patterson was clothed at least with apparent authority to send the telegram. As to what Patterson's duties were we have the testimony of the defendant, which seems to be undisputed. He testified as follows: " Mr. Patterson's duties were various. He is my book-keeper, and is there to do anything which I require him to do; but everything he does is under my instructions. He assumed no responsibility in

any way.   I have never given him authority to assume any
responsibility.   I never gave him any instructions in refer- ;
ence to making warranties.   His business is entirely cler-
ical."   We see no evidence tending to show that Patterson
was employed to sell hams or make contracts of any kind.
Now, his power to make contracts is not inferable from the
mere fact of his employment as clerk and book-keeper.   If
we should hold that such power might be inferred from such
employment, we should imperil nearly every large business
man in the country.   It is true, men act upon telegrams in
important matters, and cannot know who signed the original
telegram delivered to the transmitting office.   It is probably
true, also, that employers' names are often signed by
employes.   But no one is obliged to act upon a telegram.
We should not be justified, therefore, in holding that the
ordinary rules of agency are not applicable to the sending
of telegrams.   It appears, then, that, under the undis-
puted evidence, the instruction above set out is quite as
favorable as the plaintiffs could properly ask, and even
more so.

But it is said that the receipt and retention of the money
was, under the circumstances, a ratification of Patter-
son's act, under the doctrine of *Eadie v. Ashbaugh*, 44
Iowa, 519.

But the case at bar differs from that case in this:   The
defendant, Stewart, had made the contract for the sale of the
hams, and, as we must assume under the verdict, he actually
delivered the hams to the plaintiffs in good order at the time
of the transfer of the bill of lading.   If Patterson made a
contract with the plaintiffs, it was something additional to
the contract which Stewart made, and under which he
claimed the right to hold the money paid.

Some other questions are presented; but they will not
probably arise upon another trial, and we omit to consider

them.   For the error pointed out in the admission of Fuller's testimony, the judgment must be

REVERSED.

REED, J., dissents on the first point discussed in the opinion.

SUPPLEMENTAL OPINION.

ADAMS, CH. J.—The defendant, in a petition for rehearing, cites *Couch v. Watson Coal Co.*, 46 Iowa, 17, and *State v. Maynes*, 61 Id., 119, in support of his position that Fuller was properly allowed to testify that Hurlburt was a good judge of meats.   But neither of those cases is like the present.   In the first, the question was as to the competency of a certain employe.   In the latter, the question was as to whether a certain person who had been allowed to testify as an expert had such character.   In the case at bar, Hurlburt was confessedly an expert, and Fuller's testimony was not admitted to show that Hurlburt was competent to testify as an expert, but that, having testified as such, his skill and experience were such as to give his expert testimony great weight.   We still think that Fuller's testimony was improperly admitted, for reasons stated in the original opinion, and the petition for a rehearing must be

OVERRULED.